580 So.2d 438 (1991)
Nancy C. DIXON, et al., Plaintiff-Appellee,
v.
MID-SOUTH RAIL CORPORATION, et al., Defendants-Appellants.
No. 22102-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1991.
*439 Hudson, Potts & Bernstein by W. Craig Henry, Monroe, for defendants-appellants.
Thompson, Sparks, Dean & Morris by John C. Morris, III, Monroe, for plaintiff-appellee.
Before MARVIN, C.J., and LINDSAY, HIGHTOWER, VICTORY and BROWN, JJ.
*440 MARVIN, Chief Judge.
This appeal was heard by a five-judge panel as mandated by LSA-Const. Art. 5, § 8(B), when a judgment is to be modified and one judge on the three-judge appellate panel dissents.
The appeal by defendants is of a judgment awarding damages in a wrongful death and personal injury action arising out of a car-train collision at a railroad crossing. The defendants (who are the railroad, its engineer and conductor, hereafter singularly called the railroad) contend the trial court erred in admitting opinion evidence and the jury erred in finding fault and in awarding excessive damages.
In answer to the railroad's appeal, plaintiff, a passenger in the car and the mother of the decedent driver contends only that her son was not at fault and seeks to negate or reduce the jury's allocation of 58 percent of the fault to the decedent. At reargument, she complains, and then only in argument, of the manner in which the trial court judgment was "calculated."
The judgment awarded the mother $171,841, which was the total of all damages times the 42 percent fault allocated to the railroad. Some special damages were stipulated. The remaining damages were assessed by the jury in answer to specific interrogatories ($65,000 for the mother's personal injuries; $50,000 for her future medical; $150,000 for decedent's wrongful death; and $125,000 for her loss of decedent's services).
We amend, effectively recasting the judgment to correspond with the jury's specific assessments and fault allocations, to delete the $125,000 assessment for the loss of decedent's services and to reduce from $50,000 to $5,000 the assessment for the mother's future medical. In all other respects, and as amended, we affirm.

EVIDENTIARY ISSUES
The collision occurred during a clear, dry, spring afternoon in 1988, where Dixon Road, a gravel road crosses the railroad tracks just south of U.S. Hwy. 80. Plaintiff, Mrs. Dixon, and her son, Mitchell, lived on Dixon Road south of the crossing and were very familiar with conditions at the crossing, which Mrs. Dixon called "dangerous."
Visibility at the crossing of both the train crew and any southbound motorist was obscured by trees and unmowed vegetation on the RR right-of-way. The state trooper who investigated the accident drove southbound over the crossing, as the decedent did. He testified he did not have a clear view of the tracks until he was "up on the crossing."
When plaintiff's vehicle slowly approached the crossing, Mrs. Dixon yelled to her son, "Mitchell, the train!" Responding, he stopped the car on the track, apparently intending to back up. The diesel locomotive that struck the car was traveling westerly in a "long nose forward" position (as if running in reverse) rather than in the "short nose forward" position. The long-nose position further impaired the visibility of the crew. Experts opined that the sight distance at the crossing would not allow reasonable evasive action by an inattentive southbound motorist. The railroad contends that plaintiff's expert, Dr. Bowman, should not have been allowed to state an opinion based on data in a publication entitled Railroad Grade Crossing Handbook. Plaintiff's two experts, Dr. Bowman and Mr. Walker, explained or agreed that the handbook, which was based in part on vehicle dynamics, was not law or industry standard, but was written and compiled for use by professionals who design railroad crossings of highways.
The railroad does not complain of the instructions to the jury about weighing and assessing opinion evidence. The expert testimony about the handbook did not suggest to the jury that the handbook set forth any law or standard that was violated by the railroad. Lay testimony was also presented about visibility at the crossing. Under these circumstances, we find no reversible error in the admission of the opinion evidence complained of. Walker v. Bankston, 571 So.2d 690 (La.App. 2d Cir. 1990).
*441 The more critical factual issue is whether the train blew either its whistle or horn as the law requires. LRS 31:168. The train crew said yes, the surviving occupants of the car said no. It was the jury's prerogative to believe the occupants. Viewing the record in the light that most favorably supports the verdict, we must assume the jury believed the occupants of the car. The finding of fault on the part of the railroad is supported by the record and is not clearly wrong. See Odom v. Hooper, 273 So.2d 510 (La.1973).
Similarly, and considering decedent's familiarity with the condition of the crossing, we cannot conclude that the jury's finding of 58 percent fault on the part of the decedent was clearly wrong. Odom, supra; Rosell v. ESCO, 549 So.2d 840 (La. 1989). Mrs. Dixon said she and Mitchell knew the crossing was "dangerous ... There was no way that any of us in that family doesn't look when they cross that track."

FAULT ALLOCATION
Findings of respective percentages of fault under C.C. Art. 2323 are factual findings. Appellate courts recognize that different finders of fact may not agree on the percentages of fault in given circumstances, which in each instance will be affirmed if found within the legally allowable reasonable range upon review by the appellate court under the clearly wrong or manifestly erroneous standard. See Devereux v. Allstate Ins. Co., 557 So.2d 1091 (La. App. 2d Cir.1990).
Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), suggests these considerations to compare fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
The railroad's fault arises from the risk created by the condition of its right-of-way at and near the crossing and its failure to sound its horn or whistle. The railroad had the exclusive capacity to minimize the risk of the growth on its right of way. Mitchell Dixon's fault arises from his familiarity with the known danger at the crossing and his capacity to avoid the risk by exercising reasonable care. The fourth Watson factor (comparative capacity of the actors to avoid the accident) requires some discussion.
Mitchell Dixon slowly proceeded over the crossing at less than 10 mph. There were no extenuating circumstances which required him to proceed without carefully looking and listening for an approaching train. The train also was proceeding relatively slowly, about 25 mph. When the danger created by the respective conduct of each actor was or should have been apparent to each actor, Mitchell Dixon's capacity to avoid the collision by stopping his car was much greater than the engineer's capacity to stop the train.
While other reasonable minds might have allocated a lesser percentage of fault more pleasing to Mrs. Dixon, which lesser percentage we perhaps would have affirmed, we do not find the jury clearly wrong in its allocation of 58 percent fault to Mitchell Dixon under C.C. Art. 2323.

PERSONAL INJURY AWARD
Mrs. Dixon was awarded $65,000 for her pain and suffering. Mrs. Dixon, age 52 at the trial in 1989, had breast cancer and had undergone five reconstructive surgeries in 1983 and 1984. Her treating physician testified that the trauma Mrs. Dixon sustained fractured one of her ribs and ruptured a silicone implant in her breast, forcing the implant through the tissue and creating a pocket in her chest cavity and making her breast low and flat. To close the traumatically-created pocket and to define the lower portion of the breast and prevent further movement of the breast implant, Mrs. Dixon's skin had to be sutured to her rib. Her surgeon testified that recovery from this surgery *442 was relatively painful and that she was especially slow to heal. She continued to complain of limitation of motion which the doctor said was a common result from this type of surgery. Mrs. Dixon could expect to experience for the remainder of her life, discomfort and limitation of motion caused by scarring, according to her doctor. Further breast surgery was indicated and recommended to attempt to correct the asymmetry in Mrs. Dixon's breasts that was caused by the accident.
A factual finding of pain and suffering is entitled to much deference and will be reversed only where found clearly wrong or manifestly erroneous. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). The trauma caused Mrs. Dixon a unique and disfiguring injury, which may be permanent in the event future surgery is not entirely successful. Her injuries and her recovery from treatment thus far were severe and painful. Her limitation of motion is greater than before the accident. She did not have an extended hospital stay but was slow to heal and extremely limited in her activities for several weeks following the surgery, being unable to perform her regular household duties.
In addition to her broken rib and unique physical injuries, Mrs. Dixon suffered mental pain and anxiety in two respects. The trauma crushed and physically injured her chest where she had undergone five corrective surgeries and treatment for cancer in 1983-84. She sustained further emotional and psychological injury by having experienced the trauma that her son experienced and by having immediately witnessed with all of her senses her son's demise:
... at what point did you realize that Mitchell had died?
A: When I saw the membrane of his head laying down to the ground ...
What was the next thing that you did?
A: Oh, I just wanted to hold him. I screamed ...
What she sensed caused and is causing her further psychological and emotional distress and is compensable. See Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990); Clomon v. Monroe City School Bd., 572 So.2d 571 (La.1990).
Considering the nature and duration of her injuries, mental and physical, and the recommendation of future surgery and treatment, we conclude the $65,000 assessed as damages to Mrs. Dixon for her personal injury is supported by the record and was not an abuse of the jury's much discretion to assess general damages. Compare Ryan v. State Farm Mut. Auto Ins., 437 So.2d 898 (La.App. 2d Cir.1983); and Mouton v. Southern Pacific Transp. Co., 509 So.2d 479 (La.App. 3d Cir.1987).

FUTURE MEDICAL EXPENSE
The jury assessed $50,000 for Mrs. Dixon's future medical expense. The cost of her future breast surgery and resulting hospitalization and treatment, however, was estimated by her physician from $3,000 to $5,000. There is no other evidence or suggestion in the record of any other future medical expense.
A special damage award will not be upheld for future medical expenses which may or may not occur unless medical testimony establishes the need and the probable cost. Lloyd v. TG & Y Stores Co., 556 So.2d 629 (La.App. 2d Cir.1990); Hunt v. Bd. of Sup'rs of La. State Univ., 522 So.2d 1144 (La.App. 2d Cir.1988).
Under the circumstances of this record, we must find that the jury abused its discretion in awarding Mrs. Dixon future medical expenses of $50,000. We shall reduce this award to $5,000, the highest estimate by her physician. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).

WRONGFUL DEATH AND LOSS OF PERSONAL SERVICES
In her original petition filed September 21, 1988, Mrs. Dixon sought $600,000 in damages for her "loss of love, affection, companionship ... mental anguish ... suffered as a result of the loss of her son." In a supplemental petition filed March 9, 1989, Mrs. Dixon additionally sought the specific sum of $10,000 for her loss of her son's personal services, one of the elements *443 of wrongful death damages. See Marceleno v. State, Dept. of Highways, 367 So.2d 882 (La.App. 2d Cir.1978), writ denied, 369 So.2d 1364 (La.1979) and Cannon v. Cavalier Corp., 572 So.2d 299 (La.App. 2d Cir. 1990).
The jury's verdict was in the form of answers to interrogatories propounded to the jury by the litigants with the approval of the court. One interrogatory sought the jury's assessment of damages for Mrs. Dixon's "past and future sorrow, grief, mental anguish and depression and her loss of love, affection, society and companionship of Mitchell Dixon." The jury answered $150,000.
Another interrogatory sought the jury's assessment of damages for Mrs. Dixon's "past and future loss of personal services... by Mitchell Dixon." The jury answered $125,000.
The railroad does not complain of the $150,000 award for Mrs. Dixon's past and future sorrow, grief, mental anguish and depression and her loss of love, affection, society and companionship of Mitchell Dixon. We note and do not disturb this award which is in the upper range of awards made to a parent for the wrongful death of a "closely and uniquely related" adult or near adult child. See Siemann v. Teston, 517 So.2d 242, 248-249 (La.App. 1st Cir. 1987), and cases cited and discussed therein.
We consider the railroad's complaint that the award of $125,000 for Mrs. Dixon's loss of Mitchell Dixon's personal services was an abuse of the jury's discretion. Mrs. Dixon testified that Mitchell lived with her in Baton Rouge and Prairieville in 1981 after he had worked two months or so in Kansas. She also mentioned that Mitchell had lived and worked away from her for "a little while" in Lafayette. Otherwise, Mitchell had lived with or near his mother until she moved into a new home a few months before the fatal crossing accident.
Mrs. Dixon did not state in what year she and her son returned from South Louisiana to Rayville, where we deduce he rendered the services for which she seeks a specific recovery separate from the other elements of wrongful death damage. We reproduce her only testimony on the issue:
Mitchell and I made our living by buying older homes and re-doing them and selling them ... I did all the things myself, painting, wallpaper, the scrubbing, the cleaning, anything ... [Mitchell "assisted" me]
He did the majority of all the maintenance that I had to have done. He painted... [I had some apartments], I don't [have apartments] now, I did at the time. * * * As people moved in or out he did the painting ... he did the ... leaky faucets, he mowed the yard, just generally maintenance, you know ...
Q. Do you have any kind of estimate as to the value of the services that Mitchell provided to you?
I, that would be hard to say, it cost me $600 to have a piece of pipe run from here to about where you are sitting and he would have done it himself. There was leaks quite often in the pvc pipe and it had to be dug up ...
Another witness stated that Mitchell had built a pier and a barbecue pit at the camp house he and his mother frequented and enjoyed. The record contains no other evidence about what other "compensable" services Mitchell rendered for his mother.
Mrs. Dixon's brief on this issue states that it would be "impossible, even for an expert, to calculate the value of these ... services to any degree of certainty." But see Marceleno, supra, wherein the calculation was made. No one estimated the value of Mitchell's compensable services to his mother. No evidence suggests his mother's life expectancy.
We are not told how many apartments Mrs. Dixon owned that were maintained by her son or how many houses she and her son bought and sold in any given period of time. Mrs. Dixon disposed of her apartment or apartments after Mitchell's death but did not say why. She made no effort to produce documentary evidence (receipts, tax returns, invoices, etc.) or testimony to supply critical details of her son's services and the value thereof.
*444 If claimed separately in a wrongful death action, the recoverable value of lost personal services rendered by a decedent, such as household services, must be distinguished from the other elements of wrongful death damage, such as the loss of a decedent's love and affection, companionship, attention to routine physical and mental comfort, and earnings and support. See Marceleno, cited supra, and ALR annotations and authorities discussed and cited therein. Compare Brooks v. City of Baton Rouge, 558 So.2d 1177 (La.App. 1st Cir.1990), writ denied, 566 So.2d 982 (La.1990).
In Marceleno, cited above, $53,000 was awarded for the loss of specific personal services of a decedent which were detailed and supported by expert testimony, which award was in addition to a $60,000 wrongful death award. These awards were made to a 31-year-old widower and father of five for the loss of detailed personal services of his 25-year-old wife, the value of which services were estimated by expert opinion evidence.
This court expressed "no doubt" that the loss of a loved one's services was a real, substantial, and recoverable loss where the value of such services were supported by expert testimony. We agreed that "some services" performed by a loved one were mere non-compensable "manifestations of love and affection." We did not find it necessary to approve or disapprove the specific award, finding that the total award of $113,000 ($60,000 for wrongful death and $53,000 for loss of compensable services) was within the trial court's discretion.
In the Marceleno context, the issue is whether a $275,000 award for wrongful death damages for Mrs. Dixon is an abuse of the jury's discretion. Mrs. Dixon had the burden of proving and supporting her demands, including her separate and specific $10,000 demand for loss of her son's personal services.
The $125,000-loss-of-services award, a special damage, was an abuse of the jury's discretion in any context, whether that award be considered as a part of, or, as she alleges, separately from, her demand for damages for wrongful death.
Mrs. Dixon's allegation that her loss of her son's services was valued at $10,000 is no substitute for evidence. Any award for specific loss of services would be purely speculative. A survivor may recover damages for the loss of a decedent-loved one's services "based on the pecuniary value of the benefits she would reasonably have expected had [the loved-one] not died as a result of negligence. A method of measuring the value of this loss is by determining the cost of replacing the services." Ayala v. Bailey Electric Company, Inc., 318 So.2d 645 (La.App. 4th Cir.1975), writ granted, dismissed by joint stipulation.
Similar to the element of the loss of a decedent's services in a wrongful death action, is the element of the loss of performance of material services in consortium damages. See Finley v. Bass, 478 So.2d 608, 614 (La.App. 2d Cir.1985). There, the wife did not testify that she would not have engaged in performing such material services but for her husband's disability and she did not allege that she was forced to hire the services, "thereby incurring a financial loss." We emphasized: "Since material services are subject to reasonably certain proof, some evidence should have been offered." We determined: "In sum, [the wife] has proved only a definite loss on only one element [of the loss of consortium], sexual relations, and a potential loss of material services." We affirmed the $5,000 low-range award for the one element, without regard for the potential loss of material services. 478 So.2d at 615. In a later case, we said in the same context that there must be "some measurable loss," citing Finley. Johnmeyer v. Creel, 499 So.2d 571, 576 (La.App. 2d Cir.1986).
We consider that the loss of services element in the wrongful death damage action is an item of special damage that requires some measurable proof, more than a showing of potential loss, of the value or replacement cost of the services. We therefore conclude that when the loss of a loved one's services is claimed as a material, compensable loss, there must be some evidentiary basis to allow the trier of *445 fact and the appellate court to reasonably evaluate or measure in money the claimed material loss. The loss of material services is susceptible of reasonably certain proof. Finley, supra.
The only monetary amount that remotely reflects the value or replacement cost of the loss of Mitchell Dixon's services is Mrs. Dixon's statement that it cost her $600 to "run" a piece of pipe that Mitchell "would have done himself." She did not, and we cannot, explain or differentiate how much of this cost included material, or equipment rental or labor. As in Finley, Mrs. Dixon has established only a potential material loss, any award for which would be purely speculative and arbitrarily assessed.
When we find an abuse of discretion, we are required to reduce an award to the highest award the jury could have reasonably awarded based upon the evidence presented. Coco v. Winston Industries, Inc., supra; Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1990), writs denied, 501 So.2d 213, 215 (1987). Our attempt to assess an award for Mrs. Dixon's potential loss under the Coco standard, has demonstrated to us the validity of the principle that a plaintiff must meet her burden of proving a special damage with measurable evidence. A plaintiff pleading a special damage such as the loss of compensable services, must produce some evidence by which a trier of fact can reasonably measure that loss. Proof of a potential loss simply will not be found to meet the burden of proof.
Under the recited circumstances, we shall delete from the judgment any reflection of the jury's assessment of $125,000 for the loss of decedent's services because of the failure of Mrs. Dixon to meet her burden of proof.

OTHER ISSUES ON REARGUMENT
The judgment of the trial court against the railroad awarded Mrs. Dixon $171,841.83. This amount was reached by taking 42 percent of all stipulated and verdict damages. The judgment was "approved" by the attorney for each litigant before it was signed and appealed. In answer to the appeal, Mrs. Dixon did not complain of, or seek to increase the amount of the judgment or jury's assessment of damages in any respect, but sought only to negate or reduce the jury's allocation of 58 percent fault to her deceased son.
At the constitutional five-judge reargument, for the first time and then only verbally, and later in a supplemental brief requested by the court, Mrs. Dixon argues that she was not at fault and that she should have been awarded 100 percent of the damages assessed by the jury for her personal injury and her related stipulated special damages. In this respect, she asserts that there was "error in how the jury's findings and stipulations were `added up,' i.e. calculated," and that we or the trial court should correct the error by "proper calculation of the substantive items." C.C.P. Art.1951.
Even if we were inclined to agree that C.C. Art. 2324 supports Mrs. Dixon's argument that her personal injury and related damages should not be reduced by her son's fault, we cannot consider modifying the amount of the judgment in her favor because of when and how she has raised the issue and the means by which she seeks us to modify the awards that are personal to her and not derivative.
Mrs. Dixon makes her belated contentions only as argument and has not asserted them in her answer, or in any amended answer, to the railroad's appeal of the judgment. C.C.P. Art. 2133; Hassen v. Professional Investors Life Ins. Co., 503 So.2d 1030 (La.App. 2d Cir.1987). See also Freeman v. Freeman, 552 So.2d 636, at 639 (La.App. 2d Cir.1989).
Because she approved of the manner in which the judgment is couched (simply $171,841 in Mrs. Dixon's favor), we cannot agree with her argument that increasing the amount of the judgment is nothing more than "correcting an error of calculation" authorized by C.C.P. Art. 1951. Such a modification of damages in a judgment is substantive and must be specifically sought either by a motion for a new trial in the trial court or by an appeal, or answer *446 to an appeal, of the judgment. Jones v. Gillen, 564 So.2d 1274 (La.App. 5th Cir. 1990), writs denied 568 So.2d 1080, 1081 (La.1990); Edwin M. Jones Oil Co., Inc. v. Cobb, 469 So.2d 357 (La.App. 2d Cir.1985); Freeman, supra; Texas Bank of Beaumont v. Bozorg, 496 So.2d 1215 (La.App. 5th Cir.1986).
We have concluded that the record supports the jury's allocation of 58 percent fault to her son (her one assignment in answer to the appeal) and we cannot and do not, correspondingly, increase the jury's allocation of fault to the railroad even insofar as the railroad's fault pertains to Mrs. Dixon's personal demands.
In summary, our amendment of the $171,841 judgment results in an award of slightly over $100,000 to Mrs. Dixon, an amount we consider just and proper. C.C.P. Art. 2164.

DECREE
Reducing or deleting the jury's assessment of damages in the respects mentioned, we amend and recast the trial court's judgment. There is judgment against defendants, in solido, in favor of Mrs. Dixon for 42 percent of the following amounts, 42 percent being the percentage of fault allocated to defendants-appellants:
$150,000 wrongful death damages, including her loss of the personal services of her son;
$5,958.80 for funeral and related expenses, as stipulated;
$5,000 for her future medical expenses;
$2,938.42 for her past medical expenses, as stipulated;
$10,250 for property damage to her car and its contents, as stipulated; and
$65,000 for her personal injury damages;
together with legal interest on the awards from judicial demand. Costs of the appeal are assessed one-half to plaintiff and one-half to defendants.
As amended and recast, the judgment of the trial court is affirmed.
BROWN, J., dissents in part with written reasons.
BROWN, Judge, dissenting in part.
The application of tort law can never be a matter of mathematical precision. We impose on a jury or judge the obligation to match a money award to the injury suffered knowing that the process cannot be perfect. We recognize that the effect of each injury differs with each individual and delegate the arduous task of valuing the injury or life to the sound discretion of the trier of fact. After saddling the trier of fact with this responsibility, an appellate court must not mechanically review the exercise of their wide discretion.
It is well-settled that the amount of damages awarded at trial will not be disturbed on appeal absent a clear abuse of discretion by the trier of fact. Before an award may be questioned as inadequate or excessive, the reviewing court must look first to the individual or human circumstances of the case. Only after an articulated analysis of the facts and circumstances peculiar to the case and the individual, may a reviewing court determine that an award is excessive.
The appropriate procedure in an appellate court is to determine whether the award can be supported by any reasonable interpretation of the evidence. Like the trier of fact, an appellate court must consider the intangible mortal aspects of the case. The appellate court must first reach a determination that the trial court or jury abused its great discretion before a perfunctory resort to prior awards is appropriate. Rosell v. Esco, 549 So.2d 840 (La. 1989); Reck v. Stevens, 373 So.2d 498 (La. 1979).
In this car-train crossing accident a mother witnessed the death of her son. The case was presented to a jury who evaluated all the testimony and awarded a total of 42% of $275,000 to the mother for the wrongful death. Due solely to the manner interrogatories were presented to the jury, the award was divided $150,000 in general damages and $125,000 for loss of services. The majority of this court has mechanically set aside the jury's valuation and erased the $125,000 award stating it is unable to measure the value of loss of services.
*447 Although the jury made separate awards for loss of services and loss of love and affection, it is more correct to consider the two awards together as the total award for plaintiff's cause of action for the wrongful death of her son. Brooks v. City of Baton Rouge, 558 So.2d 1177 (La.App. 1st Cir. 1990); Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986).
The elements of damages for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Slider v. Myers, 557 So.2d 1111 (La.App. 2d Cir.1990). As noted by the court in St. Hill v. Tabor, 549 So.2d 870 (La.App. 5th Cir.1989), writ denied, 556 So.2d 1262 (La.1990), in attempting to fix in monetary terms damages to a parent for the death of a beloved child, we are acutely aware that no equation exists between the profoundness of the loss and the amount of any judgment. Such a bereavement is not easily translated into fiscal terms.
The phrase "much discretion" suggests a very broad range for awards. Society can never adequately compensate for the devastation due to the loss of a child. A monetary award is merely a practical attempt to temper the pain. We must first look to the evidence to decide if the jury abused its "much discretion" in its total award of $275,000.
Decedent was 25 years old when he died. Decedent was plaintiff's only child. Decedent's father died when he was 22 months old and he lived with his mother virtually all of his life. Decedent made breakfast for plaintiff and they went fishing every Friday together. Decedent was chauffeuring plaintiff to a wedding when this accident occurred.
Plaintiff was 50 years old at her son's death and suffered from breast cancer. Her son was her entire life. Since his death she has been totally lost. She testified:
Q: What about holidays?
A: I don't even care about anything like that any more. Mitchell and I loved to go shopping together for Christmas gifts and birthday gifts. I haven't even put up a tree since then and I'm not going to, it's just no need, what need is it?
In this case plaintiff witnessed the accident and testified:
Q: ... at what point did you realize that Mitchell had died?
A: When I saw the membrane of his head laying down to the ground ...
Q: What was the next thing that you did?
A: Oh, I just wanted to hold him. I screamed somebody get an ambulance
...
A mother has lost her only child on whom she relied for emotional stability in life and in her fight with cancer. In addition, this mother witnessed her child's death. Clomon v. Monroe City School Board, 572 So.2d 571 (La.1990).
Plaintiff testified that before the accident she engaged in buying older homes and selling them after renovations. Her son performed the necessary work for this mutual enterprise. Plaintiff also owned apartments before the accident and her son performed the necessary maintenance. Without her son and in her emotionally depressed condition due to his death, she no longer pursues these endeavors. Her son mowed her yard, built her camphouse, built a barbecue pit, chauffeured her and performed necessary maintenance for her home. The evidence demonstrates that plaintiff not only relied on her son for emotional stability but for her business ventures as well. Although the majority of this court may be unable to measure the value of these services, sufficient testimony existed to allow the jury to decide that they were valuable.
Under these circumstances the jury's award of $275,000 for this wrongful death is not clearly wrong and "is not so high that we are shocked into changing it." Brooks v. City of Baton Rouge, supra. Even if we consider the award for loss of services separately, this court is wrong to completely reverse the jury's decision. Services were rendered and are as measurable as are other intangible items. An expert may have been helpful in determining replacement cost, but not essential to *448 recovery. Brooks v. City of Baton Rouge, supra.
Without finding a factual abuse to reverse the jury's decision, we may not look at prior awards. However, a review of prior awards failed to produce any case with all the elements presented in this lawsuit. Plaintiff was emotionally and financially dependent on her son and she watched his life taken in this accident.
I further find it unconscionable for this court not to correct a clear error in the written judgment. The jury correctly found no fault on the part of Mrs. Dixon who was a passenger in the automobile. She is entitled to recover her physical injuries and associated expenses without a reduction for her son's fault. Under Civil Code Article 2324 defendant is solidarily liable to the extent necessary for Mrs. Dixon to recover fifty percent of her individual damages. LSA-C.C.P. Art. 2164 dictates that this court shall render any judgment which is just, legal and proper. Nelson v. Nelson, 318 So.2d 68 (La.App. 1st Cir.1975), writ denied, 315 So.2d 39 (La.1975) allowed a similar amendment to a judgment though neither sought nor prayed for on appeal.
I dissent to the reversal of the jury's total award of $275,000 for wrongful death as well as to the refusal to amend the judgment to correctly reflect the jury's verdict concerning Mrs. Dixon's physical injuries and associated expenses.