606 So.2d 854 (1992)
James M. JOHNSON and Mattie Cortez Johnson, Plaintiffs-Appellees,
v.
Michael A. GANTT, Defendant, and
the Town of Cullen, Defendant-Appellant.
No. 24008-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
Writ Denied November 30, 1992.
*855 Mayer, Smith & Roberts by Steven E. Soileau, Shreveport, for appellant Town of Cullen.
Charles A. Smith, Minden, John M. Robinson, Springhill, for appellees James & Mattie Johnson.
Before MARVIN, C.J., and NORRIS and BROWN, JJ.
MARVIN, Chief Judge.
In this wrongful death action, we affirm a judgment against the Town of Cullen totalling $380,000 in favor of the parents of 20-year-old Monty Johnson, who was killed when his 23-year-old friend, Michael Gantt, an armed and uniformed Cullen policeman, accidentally shot him in the Cullen police station 15 minutes or so after he and another friend returned to the station with Officer Gantt about an hour after Gantt signed off duty around midnight.
Gantt, who had pleaded guilty to negligent homicide, was also cast in the judgment in this wrongful death action, but does not appeal.
The primary issues concern the trial court's findings that the Town is liable, both vicariously (Gantt was within the course and scope of his employment) and independently (for negligently hiring and failing to train Gantt in firearms safety). Roberts v. Benoit, 605 So.2d 1032 (La. 1991); Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990); LeBrane v. Lewis, 292 So.2d 216 (La.1974).
The Town's appeal also questions whether the fatal shot was accidentally or intentionally fired and whether the court abused its discretion in awarding general damages of $185,000 to each parent. The plaintiffs answer the Town's appeal, seeking to increase the award.
We agree with the court's finding that the Town is vicariously liable for the negligence of Gantt. Affirming on that basis, we need not and do not consider whether the Town was independently negligent. Compare Roberts, supra.
We review the record in the light that most favorably supports the judgment, concluding that Gantt, although technically off *856 duty for about an hour before returning to the police station while armed and uniformed, was in the scope and course of his employment when the fatal shooting occurred. In the police station with the victim and another friend, Gantt first unholstered and thereafter negligently manipulated his pistol for several minutes while engaged in a telephone conversation piqued by both his personal and professional curiosity. Gantt's telephone conversation was actuated to some appreciable extent by Gantt's desire to "serve" his employer, the police department of the Town. Ermert, supra, at pp. 478-9.

FACTS
Three months before the January 1991 shooting, Gantt was hired as a policeman for a six-month probationary period to work 32 hours per week. Gantt was then 22 years old, had no prior law enforcement or military experience, and had only completed the ninth grade in school. He was working to achieve a General Education Diploma (GED), the equivalent of a high school diploma, which was required for him to enter basic training at the police academy in Haughton. Cullen required its police officers to complete the basic training as a condition of their being granted full-time permanent employment in that capacity.
The Town provided Gantt with a badge, a uniform and a bullet-proof vest. Gantt furnished his own pistol. Gantt had some limited experience with guns but did not own one until he bought a .357 Magnum shortly after he was hired. The Town was aware and expected, however, its officers to carry a pistol as Gantt had during each day of his employment.
The mayor of Cullen, Bobby Washington, served as the acting police chief during Gantt's employment which began October 1, 1990. Two other officers besides Gantt were employed by the Town, one of whom, John Tofton, like Gantt, was a part-time officer paid by the hour. The most senior officer was Mary Ann Hoof, who was hired about May 1, 1990. She was assigned the duty of training Gantt in "basic procedures of a police officer," such as writing arrest reports and traffic tickets. She had completed the police academy basic training while working part-time as a police officer. The Town and Gantt contemplated that he would complete his GED and then the basic training while working part-time.
Gantt's superiors did not ask him what he knew about guns or take him to a shooting range to assess his firing abilities. Officer Hoof told Gantt only two things about handling his gun: "Never pull it unless your life [is] in danger, and don't leave it laying around."
Gantt worked sometimes alone and sometimes with Officer Hoof. Mayor-Chief Washington and Hoof knew that Gantt, who had a police radio scanner at his home, often responded to "calls" requiring the presence or assistance of the Cullen police when he was technically "off duty." Hoof also knew that Gantt sometimes responded to calls from outside, but nearby, the corporate limits of Cullen. She responded with him to one such call within a few hours of the fatal shooting.
Gantt's shift began at 4:00 p.m. Saturday, January 12, and ended at 1:00 a.m. on January 13, 1991. The fatality occurred about 2:00 a.m. Early on Saturday evening Gantt and Hoof responded to a call about a sick dog, apparently a stray, in someone's garden. Gantt shot the dog three times, killing it. He immediately took the three spent shells out of his gun and put them in his pocket, intending to take them to his father-in-law who reloaded shells for him. Three live rounds remained in Gantt's gun. Gantt did not keep extra live shells on his person, but in a drawer at the police station. He did not reload his gun when he and Hoof returned to the station after killing the dog.
Later on that evening, Gantt and Hoof, having arrested a female, transported her to the nearby police station in Springhill to book and incarcerate her. The City of Springhill and the Town of Cullen have a common corporate boundary, the northern limits of Cullen abutting the southern limits of Springhill. While in the Springhill station, Gantt answered a telephone report by Ms. Kris Ann Gunn, who said that someone *857 had broken the windshield of her car. Ms. Gunn lived immediately south of the Cullen corporate limits.
Gantt knew both Ms. Gunn and her mother, who lived in Cullen. About a month before the fatal shooting Gantt began investigating her mother's complaint of checks being stolen from her home in Cullen. Gantt referred to Ms. Gunn thereafter and in his testimony as Kris Ann. Gantt knew that the mother suspected that either Kris Ann or her brother, Michael Mickens, had stolen her checks.
Kris Ann said she told Gantt in her telephone report at the Springhill station that she suspected her brother had broken her windshield and would likely flee to their mother's home in Cullen.
In response to Kris Ann's telephone report, Gantt relayed the report to a deputy sheriff, who in turn broadcast the report on the police radio to the attention of any officer in the area of Cullen near the Gunn residence. After Gantt and Hoof completed their task at the Springhill station, they drove to Kris Ann's residence, aware, of course, that she lived south of Cullen, outside their jurisdiction. They stayed for a few minutes, departing when a state trooper responded to the radio call.
Gantt's friends, Monty Johnson and Chad Waits, who were also friends of Kris Ann Gunn, met Gantt at the Cullen police station about 30 minutes before his shift ended at 1:00 a.m. on January 13. Gantt signed out as of 1:00 a.m. and left the station with them around 12:45 a.m. They drove in Chad's car to Kris Ann's home to again "check on" the windshield incident. With her husband at work, Kris Ann was at home with her three children. One of her children was frightened by the windshield incident. Gantt told Kris Ann he was "off duty" and had come to "make sure everything was okay" before he went home. Kris Ann reported no further problems, and Gantt and his friends departed about 15 minutes after arriving there.
Gantt, Monty and Chad then drove to Springhill, where they bought gasoline for Chad's car and stopped for a few minutes at McDonald's restaurant to visit Gantt's wife who was employed there. Departing for Gantt's home to get something to eat, they stopped at the Cullen Police Station to allow Gantt and Monty to obtain their respective vehicles. Not having a telephone at home, Gantt, accompanied by his friends, unlocked and entered the Cullen police station where he telephoned Kris Ann's home to again "check on" her broken windshield complaint.
Gantt learned that Kris Ann was secure. According to Kris Ann, Gantt jokingly asked her whether "the other windshield" had been broken. Gantt and Kris Ann conversed as friends about other things for about 15 minutes, with Gantt relaying Kris Ann's end of the conversation to Chad and Monty, who also were her friends. This part of the conversation, by Gantt's description, was "guys and girls talking ... we were just more or less joking around" about taking girls to a haunted house and about Gantt, Chad and Monty being "the three musketeers" or "the three stooges." Gantt acknowledged the conversation was "personal" and did not involve "Cullen police business." The trial court concluded otherwise from the totality of the evidence.
While conversing with Kris Ann, Gantt took his service revolver out of his holster and began manipulating it. While he was handling the gun, it discharged, striking Monty in the face and apparently killing him instantly. After the shooting, his gun was found to contain two live rounds, one spent shell and three empty chambers.
Ms. Gunn said that during the phone conversation, several minutes before she heard the shot, Gantt "was discussing [his gun] with Monty and Chad and me about the dog he had shot earlier that day and he was fixing to reload. And I told him to put it up." She had not mentioned this in her deposition taken a few months earlier, explaining that she had forgotten these details. She admitted being twice convicted for issuing one or more worthless checks.
Chad Waits testified that when he, Monty and Gantt arrived at the station to obtain the other two vehicles, Gantt said he was going inside to make a phone call. Chad was aware that Gantt did not have a *858 phone in his home. Gantt did not mention to Chad then or later that he was going inside the station to get bullets for his gun. The litigants dispute why Gantt went to the station and how and why he was handling his pistol.

GANTT'S EXPLANATIONS
The first officer to respond to Gantt's radio calls for help was State Trooper Ted Riser. Riser testified that Gantt told him that he was "jacking around" with the gun, he knew there were empty chambers in the gun since he had shot it earlier that day, and he turned the cylinder to what he thought was an empty chamber, pointed the gun at Monty and pulled the trigger to scare him.
Gantt gave a recorded statement to Webster deputies Jimmy Morgan and Gary Sexton a few hours after the shooting. Gantt said he looked inside the cylinder of his gun, pulled it around to where he had earlier removed the three spent shells, "put it where the shell would not go ... in the chamber ... shut the chamber ... I just raised it up. And all I heard was pow and that was it." Gantt told the deputies he and Monty had "messed around" with an unloaded gun "at the house" about a month earlier. In this statement, Gantt did not say anything about wanting to scare Monty with his pistol.
Bobby Washington, the mayor and acting police chief of Cullen, testified that Gantt told him the morning after the shooting, "I had some empties in my gun and I was taking them out and somehow the gun went off and hit Monty."
Both Gantt and Hoof testified that Gantt removed the empty shells from his gun after he shot the dog earlier on that fatal night. When asked what Gantt told her about the shooting of Monty, Officer Hoof said, "He was on the phone and he had his gun and he was pulling the [hammer] back and forth, and it went off. It was an accident."
Gantt pleaded guilty to negligent homicide in May 1991, five months before the civil trial. At the guilty plea hearing, the DA related Trooper Riser's account of the shooting:
[Riser] asked the defendant what happened and the defendant said he and the victim were jacking around. Gantt said he was going to scare the victim. His revolver was on the desk by the phone. He had fired the revolver earlier in the day and he had not replaced the cartridges. Gantt said he picked up the revolver, turned the cylinder so that the next shot fired would fall on an empty chamber. That he pointed the gun toward the victim and pulled the trigger and he said that the victim couldn't have been hurt because the gun just went poof. But, nevertheless, the victim was shot through the head and died.
After some discussion with Gantt, the court said at the guilty plea, "he states he agrees with the recitation of facts stated by the district attorney in its entirety with the one exception that he did not intentionally point the gun, but admits he accidentally pointed the gun. Every other portion of the recitation of facts he agrees with." Gantt said the court's statement was correct.
At trial of the wrongful death action before the same judge, Gantt admitted that he must have had his finger on the trigger but denied that he intended to pull the trigger "where there wasn't a live round" to scare his victim. Defendants presented Trooper Riser's testimony and a transcript of the guilty plea hearing to counter Gantt's denial.
Gantt's explanations also varied about how, why and for what purpose he began manipulating the pistol while on the telephone. At one point, Gantt said he had unloaded the three live shells from his gun before he signed off duty and he reloaded them while he was on the phone with Kris Ann. At another point, Gantt said the gun went off while he was checking it "to make sure [it] didn't have no live rounds in it."
Gantt said he pulled the hammer partially back with his thumb two or three times because the cylinder would not go back in the slot. He said he had his finger on the trigger as he did this, but denied that he *859 intended to pull the trigger to scare Monty. Gantt also denied that he aimed the gun at Monty, saying, "I was just fooling with the gun. He was in that, what you call range." In this respect, the trial court labeled Gantt's conduct "horseplay."
Gantt admitted at trial that he and Monty had sometimes "played with unloaded guns" at home by pulling the trigger and clicking them at each other, and that Monty had done that to him a few weeks before the shooting. Gantt said he was not "playing with his gun" in any way at the time of the shooting.
At another point in his testimony, Gantt stated that he went back inside the station to get the three empty shells that he put in his desk drawer when he returned from shooting the dog. Gantt's final explanation, after further questions, was that he could not remember whether he went into the desk drawer for live shells or for empty shells.
Chad Waits, the only eyewitness to the shooting, testified that Gantt "pulled his gun out, and he was checking it and stuff.... I heard ... a loud sound, and I seen Monty fall."
The several officers who questioned Gantt after the shooting said Gantt explained that he went inside the police station to telephone Ms. Gunn. At trial, Gantt added that he went inside to reload the three live shells he had taken out of his gun and put in his desk drawer just before signing off duty, explaining that he does not "carry a loaded weapon riding around with some guys even though they are my best friends."
Gary Sexton, the sheriff's deputy who examined Gantt's gun after the shooting, found two live rounds, one spent casing in line with the firing pin and three empty slots in the gun, which appeared to be in proper working order. Gantt gave Sexton three empty shells that he then had in his pocket.
Gantt had not had any alcohol to drink on the night of the shooting. He effectively resigned from the police force by turning in his badge the next day.

FINDINGS, HERE AND BELOW
The trial court obviously accepted Gantt's several explanations about why he returned to the police station and about why he was manipulating his gun during the telephone conversation with Ms. Gunn. We recognize the trial court's prerogative and discretion to assign credibility and to weigh and assess evidence, about which reasonable minds may draw different conclusions. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trial court obviously did not adopt the Town's arguments that the shooting was intentional, that Gantt pulled the trigger to "scare" his victim, and that Gantt violated several rules of the Town and was wholly and solely engaged in purely personal matters and was not performing any employment-related duty when the shooting occurred.
On the totality of the record, these factual findings by the trial court, express and implied, are not clearly wrong:
The shooting was accidental and was not intentional;
Gantt went to the station for two reasons: To telephone Ms. Gunn and to get either live or fired cartridges for his pistol;
Gantt was on "on call" status when he entered the police station with his key shortly before the fatality in that while there he could have and would have responded to a "call" to the Cullen police as he had sometimes done in the past, even from his home, responding to the police radio scanner, when he was technically signed "off duty";
By responding with Gantt to the call he received in the Springhill police station from Ms. Gunn and not otherwise forbidding his face-to-face inquiry at her home outside the Cullen corporate limits about the broken windshield and her well-being, Gantt's superior, Officer Hoof, effectively sanctioned Gantt's later telephone call from the station to Ms. Gunn as being in the course of and arising out of his professional service.

*860 LEGAL ISSUES
Gantt's negligence, factually and legally, caused the fatality. The Town of Cullen may be liable for his tortious conduct if that conduct was "in the exercise of the functions in which [he] was employed" C.C. Art. 2320. This test for imposing vicarious liability on an employer for the tortious conduct of an employee greatly resembles the test for worker's compensation liability in that an employer "should be held to anticipate and allow for risks to the public that `arise out of and in the course of' the employment." Ermert, supra, 559 So.2d at 476. LeBrane, supra, suggests these additional questions:
Was Gantt's conduct reasonably incidental to the performance of his duties as a police officer?
Where did the conduct occur? and Did the conduct occur during working hours?
The focus is on the employee's general activities at the time of the tortious conduct rather than on the specific tortious act. The fact that the act is forbidden or is done in a forbidden manner does not remove that act from the scope of employment. Ermert, supra, at p. 479. Each case on the imposition of vicarious liability is determined, of course, by its own circumstances. Turner v. State, 494 So.2d 1292 (La.App. 2d Cir.1986); Roberts, supra.
Instead of forbidding him, Gantt's superior, Officer Hoof, accompanied Gantt to personally inquire to Ms. Gunn about the broken-windshield incident. The fact that Ms. Gunn lived outside the Cullen corporate limits does not, of itself, preclude the trial court's finding that Gantt was in the scope and course of his employment. See and compare Lamkin v. Brooks, 498 So.2d 1068 (La.1986).
The Town contends that Gantt should be found outside the course and scope of his employment because he was violating the Town's rules against "loitering on city property after work hours," against allowing civilians without police business inside the police station, against wearing his uniform while off duty and against "horseplay" on the job.
Gantt's account of the extent to which these rules were enforced differed from Mayor-Chief Washington's account. Gantt's superiors were aware that he had a key to the police station and that he went there apparently at will or sometimes in response to calls after signing off duty.
Even if we disagreed with the trial court's implied finding that Gantt did not violate one or more of the Town's rules and assume to the contrary for discussion purposes, that assumption would not preclude the finding that the Town is vicariously liable for his tortious conduct.
The test of the master's responsibility for the acts of his servants is not whether such act was done in accordance with the instructions of the master to the servant, but whether it was done in the prosecution of the business that the servant was employed to do, and an act is regarded as "authorized" in the legal sense if it is incidental to the performance of the duties entrusted to the servant even though it is in disobedience of the master's express orders and instructions.

Bordelon v. Great American Indemnity Company, 124 So.2d 634, 638 (La. App. 3d Cir.1960).
Gantt's superiors also were aware that he wore his gun, even used it (shooting the dog), and obviously did not forbid Gantt from attempting to manipulate or load and unload it in the Cullen station.
Even assuming that the predominant motive of Gantt was "personal" (his return to the station to telephone Ms. Gunn) does not relieve Cullen from vicarious liability if a secondary motive was to "serve" the Cullen police to any appreciable extent. Ermert, at p. 477.
Gantt's relationship with Ms. Gunn, as far as this record shows, was platonic, initially arising out of his investigation of her mother's complaint of the theft of checks in Cullen. The mother's complaint was made about a month before the fatality occurred. A few hours before the fatality, Ms. Gunn told Gantt in her telephone complaint that *861 she suspected her brother of breaking her windshield and that he might go to their mother's home in Cullen. Ms. Gunn's telephone complaint to Gantt was not personal, but was made to the Springhill police station where Cullen police duties carried Gantt and his superior, Officer Hoof. Both Hoof and Gantt went to Ms. Gunn's home after her complaint was relayed to a sheriff's deputy.
Gantt and Hoof exhibited professional police curiosity in the broken-windshield incident, which had Cullen "connections."
Gantt's general activities at the time of the fatality were "closely connected in time [on the same night of the trip to the Springhill police station and to the home of Ms. Gunn for the purposes mentioned], place [the Cullen police station] and causation [manipulating his pistol to determine whether to load or unload or replace spent cartridges during the telephone conversation] to his employment duties as to be regarded as a risk of harm fairly attributable to the [Cullen Police Department's] business as compared with conduct motivated by purely personal considerations entirely extraneous to the [Department's] interests." LeBrane, supra, 292 So.2d at p. 218. Our emphasis.
This purely personal-entirely extraneous test was paraphrased in Roberts, supra, which, on rehearing, did not impose vicarious liability on the sheriff because the tortious "deputy" "was not engaged in any law enforcement activity at the time [and place ] of the incident." Our emphasis and brackets.
In short, we cannot say Gantt's entering the station to make the telephone call and his manipulation of the pistol during the call was purely personal or entirely extraneous to the "business" of the Cullen Police Department. The conclusion is not strained that Gantt's "interest," on the night of the fatality, in Ms. Gunn and her broken windshield, and, a month earlier, in the theft of her mother's checks in Cullen, to some appreciable extent, was a professional police interest. Compare LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La. 1978) and the worker's compensation cases considering the arising-out-of-and-in-the-course-of issues cited in Malone-Johnson, §§ 161-200.
When Benoit, a cook and only technically a deputy, accidentally shot his victim, neither the time, place nor causation factors of LeBrane supported imposing vicarious liability on his sheriff. Benoit was clearly off duty away from the place of his employment, had bathed at home and then dressed in civilian garb to go elsewhere, had gotten drunk, and had continued to drink and to play with his pistol for 45 minutes after being cautioned by friends to put it up and stop such conduct. Because of Benoit's circumstances, his employer was not found vicariously liable on the square factual conclusion on rehearing that "even assuming Benoit was a deputy in fact as well as in name, he was not engaged in any law enforcement activity at the time of the incident." Roberts, 605 So.2d at p. 1059. Our emphasis. Even the dissents to both the Roberts original opinion and the rehearing opinion essentially agreed on that point. The dissents are directed to the independent negligence of the employer in hiring and training deputies.
Here, we consider only the vicarious liability of the employer to compare Gantt's conduct with that of Benoit in Roberts. Benoit's motivation for his conduct (not engaged in any law enforcement activity) was effectively found on rehearing to be purely personal, entirely extraneous to his duty as a sheriff's cook, to use the Le-Brane language. By entering the station, telephoning Ms. Gunn and manipulating his pistol, Gantt was engaged to some appreciable extent in law enforcement activity and his motivation was not purely personal, entirely extraneous to his service as a policeman. Time, place and causation factors support the judgment. Roberts, Ermert, and LeBrane, cited supra.

GENERAL DAMAGES
Affirming the award, we recently noted that a wrongful death award of $150,000 "is in the upper range of awards made to a parent for the wrongful death of *862 a `closely related' adult or near adult child." Dixon v. Mid-South Rail Corp., 580 So.2d 438, 443 (La.App. 2d Cir.1991), J. Brown dissenting, writ denied. Compare James v. State Farm Mut. Auto Ins. Co., 597 So.2d 555 (La.App. 1st Cir.1992), wherein the relationship between the parent and child was something less than "unusually and uniquely close." There a $200,000 award was reduced to $150,000. See also Hood v. State through DOTD, 587 So.2d 755 (La.App. 2d Cir.1991), writ denied, wherein we affirmed an award of $175,000 to each parent for the wrongful death of their 13-year-old son.
Here the 20-year-old victim resided with his parents. His two older brothers lived with their own respective families. The decedent assisted his retired mother who had had several heart attacks within six months before his death. He worked with his father and brothers in gathering and hauling pulpwood. He worked with his father, maintaining the family occupational and recreational vehicles. His father intended to "semi-retire" and to "give" the decedent his pulpwood equipment to enable him to enter business with him when he reached his 21st birthday.
Referring us to awards less than the $185,000 here awarded each parent, the Town asserts the relationship here was not unusually and uniquely close. Plaintiffs refer us to awards more than $185,000, but simply assert that if the trial court abused its discretion it was on the "inadequate" side. In our opinion, the award, while in the upper range of discretion, is not an abuse of discretion in either respect under the circumstances of this record.

DECREE
As directed by LRS 13:5112, we assess costs, insofar as the law allows, to the Town. The statute directs that costs be expressed "in a dollar amount in a judgment of the trial court or decree of the appellate court." Plaintiffs expressly ask us to state the dollar amount of the costs as the statute directs.
We are certain only of the amount of the fee charged by the clerk of this court for filing the appeal ($112.50). We assess that amount to the Town, as costs. We are aware that other costs are charged and collected in the trial court. We do not know these costs in each trial court. We reserve to plaintiffs the privilege of seeking, in the trial court, any costs which the Town may legally owe, in a further proceeding.
The judgment appealed is AFFIRMED.