637 So.2d 555 (1994)
Evonne DISMUKE, et al., Plaintiffs-Appellees,
v.
Alexander QUAYNOR and Grambling State University, Defendants-Appellants.
No. 25482-CA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1994.
Writ Denied July 1, 1994.
*557 Winston G. DeCuir & Associates by Winston G. DeCuir and Michael R.D. Adams, Baton Rouge, for defendants-appellants.
Jack Wright, Jr., Monroe, for plaintiffs-appellees.
Before MARVIN, NORRIS and VICTORY, JJ.
NORRIS, Judge.
Elvin Dismuke, on behalf of his then minor daughter, Evonne, sued defendants Alexander Quaynor and Grambling State University for injuries sustained when she was allegedly raped by Quaynor, a Grambling employee.[1] In March 1992 Quaynor pled guilty to carnal knowledge of a juvenile. Prior to the civil trial, Mr. Dismuke confirmed a preliminary default against Quaynor for $110,000. At trial, the court found Grambling vicariously liable and awarded Evonne $110,000. Only Grambling has appealed, contesting the finding of vicarious liability and the assessment of damages in the same amount awarded in Quaynor's default proceeding (which it was not informed of and did not attend). For the reasons expressed, we affirm.

Factual and procedural history
In the summer of 1989, Evonne, 15 years old, enrolled in the National Youth Sports Program ("NYSP"). The NYSP was sponsored by Grambling as an educational day camp for boys and girls ages 10 through 16 and staffed by Grambling employees and student aides. NYSP campers attended classes on Grambling's campus daily from 9:00 a.m. through 3:00 p.m. Before the program began, staff members were instructed to maintain constant supervision over the campers, especially to see that they did not go around unsupervised on the campus. In particular, staff members were to assure that campers stayed away from the Student Union, the "Village," and caught their rides directly after classes ended each day. When the campers arrived on the first day, the counselors held an orientation at which they specifically instructed the campers to stay out of the Student Union; it was "off limits." R. pp. 181, 327. Evonne's aerobics class, however, was actually held in a room (the Black and Gold Room) in the Student Union; campers were closely supervised during this class. According to Coach Collins, NYSP staff members were told to maintain constant supervision of the campers, even to accompany them to the restroom. R. p. 167. They were specifically instructed to make sure that campers did not go to the Student Union unless they were supervised.
Quaynor, a 25 year old Grambling college student and former member of the football team, was hired as an aide to the professional trainer coaching NYSP boys flag football. *558 According to Evonne, Quaynor was her counselor on the first day of the program and gave her group a tour of the campus facilities where the program would be conducted. Coach Willis, the liaison officer for NYSP, testified that they did not conduct campus tours at orientation; both he and Coach Collins, the NYSP director, testified that Quaynor was hired to instruct boys only and did not supervise girls. The record shows, however, that all students and staff were together at roll call each morning and at the end of each day. Evonne testified that a few weeks before the sexual encounter, Quaynor approached her as she was walking to class, touched her back and asked her if she was a virgin. When she said she was, he told her, "You ought to let me be your first." She testified she also told him she was not a Grambling student but an NYSP camper. R. p. 137. In his deposition, Quaynor admitted that he saw Evonne on Grambling's campus several times before the incident in question, but denied knowing that Evonne was in NYSP; he thought she was a college student.
Quaynor's final contact with Evonne occurred on June 27, 1989, and forms the basis of this appeal. On that morning, Coaches Willis and Collins decided to dismiss the campers at noon or shortly thereafter instead of 3:00 p.m. because of bad weather. According to Coach Willis, they did not phone the parents, but told them (and the bus drivers) about the early dismissal as they dropped off the children that morning. Evonne, however, missed this instruction. Evonne and her friend Melissa Neal, also an NYSP camper, rode to and from school with Melissa's mother. Mrs. Neal took classes at Louisiana Tech and would therefore drop the girls off shortly before 8:00 a.m., when her classes started, and pick them up shortly after 4:00 p.m., when her classes ended. For one hour in the morning and afternoon, Evonne and Melissa were to wait with Mrs. Neal's sister-in-law, Mrs. Iris Champion, who worked on the Grambling campus in Adams Hall, three blocks from the gym.
Around noon, Evonne's aerobics instructor, Ms. Betty Jordan, released her when Evonne and a friend told her they were going to catch their ride home. R. p. 332. Instead of walking to Mrs. Champion's office, the girls walked straight to the Student Union. They went upstairs to the second-floor game room, but found it was closed. Evonne then told Melissa she had to use the restroom; Melissa replied she would wait for Evonne downstairs. Evonne testified that as she entered the second-floor restroom, Quaynor grabbed her from behind, dragged her to the Black and Gold Room, and raped her. Quaynor admitted in deposition that he had sexual intercourse with Evonne, but claimed he was "seduced." Evonne testified that Quaynor threatened to kill her if she told anyone; she told no one about the incident until she got home.
Coach Willis testified that he dismissed his entire staff around 12:30 that day, after all the campers had boarded their buses. He insisted that Quaynor was not on duty when he went to the Student Union. According to Quaynor, however, he went to the Student Union that day in his capacity as a counselor to see if the boys in his program were "acting up." Quaynor dep., 29. The previous day he had heard that some NYSP boys were causing a disturbance in the Student Union, and he wanted to check on the situation. Coach Willis testified that he did not ask Quaynor to check the Union, and this was not one of Quaynor's assigned duties. However, Quaynor testified that one of his duties was to make sure that NYSP campers caught their rides and went home. Dep., 48. This understanding of his assigned duties corresponds with the goal of constant supervision that the sponsors impressed on the staffers at the outset of the program.
Testimony from Evonne, her parents, social worker and pastor showed that her personality changed after this incident. She suffered depression, nightmares and social withdrawal. Initially she was treated by a male psychologist, but felt uneasy and began seeing a female psychiatric social worker, Dr. Susan Davidson. Dr. Davidson testified that Evonne's symptoms were common among rape victims. Dr. Davidson diagnosed post traumatic stress disorder, and opined that Evonne could suffer future emotional problems such as low self-esteem and difficulty with sexual intimacy.
*559 Evonne's father filed suit on her behalf against both Quaynor and Grambling. Quaynor did not answer so Mr. Dismuke took a default judgment against him for $110,000. After Mr. Dismuke confirmed the preliminary default, Grambling filed a rule to set aside the judgment alleging, as codefendant, that its presence was required at the confirmation hearing. The trial court dismissed Grambling's rule, finding it failed to show fraud or ill practices as required to set aside a final judgment. This court denied Grambling's request for supervisory writ, finding no palpable error. Grambling alone proceeded to trial.
In its reasons for judgment, the trial court observed that the incident would not have occurred but for the student and counselor relationship; that the initial meeting between Evonne and Quaynor took place when the program was in session; and that the sexual encounter occurred on campus at a time when classes were normally in session. Finally, the court noted that Quaynor admitted going to the Student Union to check on the boys in his program. Based on these facts, the court rendered judgment against Grambling, concluding "the tortious conduct was reasonably incidental to the performance of his [Quaynor's] duties such that the risk of harm to young female students was reasonably attributable to his employer who placed him in that position of authority." R.p. 127. The court found that the previous assessment of damages against Quaynor was "reasonable and in accordance with the evidence presented" and awarded Evonne $110,000. R. p. 120.
Grambling appeals on grounds that the trial court erred in (1) finding it vicariously liable and deeming Quaynor's act within the course and scope of his employment; and (2) fixing damages against Grambling identical to those assessed at Quaynor's default proceeding for which Grambling was not present. Ms. Dismuke did not appeal; however, she asserts in brief that she is entitled to at least $150,000 in damages.

Vicarious liability
Employers are answerable for the damage caused by their employees in the exercise of the functions in which they are employed. La.C.C. art. 2320. The employer's liability in such a case is called vicarious liability. Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968). The findings that support or refute vicarious liability are factual in nature and, as such, regulated by the manifest error rule. Austen v. Sherwood, 446 So.2d 274, 279-280 (La.1984) (Watson, J., on rehearing). Under the rule, the issue for the reviewing court is not whether the trial court was right or wrong, but whether the factfinder's conclusion was reasonable. Stobart v. State of La., DOTD, 617 So.2d 880 (La.1993). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id., at 883; Canter v. Koehring Co., 283 So.2d 716 (La.1973). We review the record in the light that most favorably supports the judgment. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993); Johnson v. Gantt, 606 So.2d 854 (La.App.2d Cir.), writ denied 608 So.2d 196 (1992).
Determining which acts of employees make the employer vicariously liable has been the subject of considerable jurisprudence. In LeBrane v. Lewis, 292 So.2d 216 (La.1974), the Supreme Court held that the employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. Id., at 217. The court then applied four factors as an aid in finding that an act is within the course and scope of employment:
1. Was the tortious act primarily employment-rooted;
2. Whether the act was reasonably incidental to the performance of the employee's duties;
3. Whether the act occurred on the employer's premises; and
4. Whether it occurred during the hours of employment.
292 So.2d at 218.
A few years later, however, the Supreme Court cautioned that the LeBrane v. Lewis factors were not exclusive, inflexible rules that must be met in every case before liability *560 may be found. Miller v. Keating, 349 So.2d 265 (La.1977). The court explained:
It was our general evaluation of the circumstances of the tort in LeBrane as being one which evolved out of a dispute relating to the employment, one which was reasonably incident to the steward's duties as a hotel employee, and one which was closely connected to those duties (rather than as a purely personal matter) which prompted us to regard the incident as one where the risk of harm was fairly attributable to the employer's business.

Each question of an employer's response in damages for the intentional torts of his employee must be looked at on its own merits to determine whether the conduct is to be regarded as within the scope of the employee's employment.
349 So.2d at 269 (emphasis added).
In Miller the Supreme Court found the employer liable for the tortious acts of its employee who planned and participated in a battery on a former company vice-president. The Supreme Court rejected the court of appeal's strict application of the LeBrane factors and reversed that court's finding that the tort was not committed within the course and scope of the employee's employment or in the exercise of the functions in which he was employed.
The Supreme Court more recently considered the proper test for vicarious liability in Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990). The court reiterated that the finding that an act was within the course and scope of employment is governed by the manifest error rule. Id., at 475. In Ermert, the tort was the negligent discharge of a shotgun by the president of the corporate defendant, with the result of injuring the plaintiff's foot. The court first held that the rules for determining the liability of the employer for the conduct of both "superior servants" (like a corporate president) and regular employees are essentially the same, although the dissimilarity of their duties and responsibilities must be taken into account. In other words, courts often attempt to determine whether, in light of the authority given to the employee, his tortious conduct was reasonably foreseeable. This foreseeability, however, is "quite different from the `foreseeably unreasonable risk of harm' that spells negligence." Id., at 476. The court explained:
In determining whether a particular accident may be associated with the employer's business enterprise, courts often attempt to determine whether, considering the authority given to the employee, the employee's tortious conduct was reasonably foreseeable. * * *
What is considered reasonably foreseeable in this context, however, is quite different from the "foreseeably unreasonable risk of harm" that spells negligence. Rather than looking for risks that can and should be avoided, the court must essentially decide whether the particular accident is a part of "the more or less inevitable toll of a lawful enterprise." * * *
When considering which risks the employer must bear under vicarious liability, * * * the proper test bears more resemblance to that which limits liability for workers' compensation than to the test for negligence, because the employer should be held to anticipate and allow for risks to the public that "arise out of and in the course of" his employment of labor.
559 So.2d at 476 (citations omitted).
Synthesizing the analysis of Miller v. Keating and Austen v. Sherwood, supra, the court concluded that because vicarious liability is based on the attribution of business-related risks to the enterprise, specific conduct may be considered within the course and scope of employment even though it is done in part to serve the purposes of the servant or of a third person. Id., at 476-477. In conclusion, the court held:
The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. [T]he act may be found to be in the service if not only the manner of acting but the act *561 itself is done largely for the servant's purposes.
559 So.2d at 477 (citations omitted, emphasis added).
In the instant case, Grambling's employee, Quaynor, committed a wrongful act on Grambling's campus during normal class hours and almost immediately after classes had been dismissed on this particular day because of bad weather. The trial court specifically found that the tort also occurred while Quaynor was, to some appreciable extent, engaged in an employment-related activity, even though he was probably technically off duty for the day. The evidence supports this finding. Quaynor testified that right after his work day was cut short due to the weather, he walked directly to the Student Union, about 50 feet away, to see if any of his campers were causing a disturbance, and to make sure they caught their rides and went straight home.[2] Regardless of whether this was an "assigned duty," one of Quaynor's motives, albeit secondary, for going to the Student Union, promoted Grambling's interest in, or implemented its expressed policy of, closely supervising NYSP campers at all times and keeping them out of the Student Union. Ermert v. Hartford Ins. Co., supra; Johnson v. Gantt, supra. On the record presented, the trial court was not clearly wrong to find that Quaynor's acts at the time of the tort served Grambling's interest to an appreciable extent. Stobart v. State of La., DOTD, supra. See also Samuels v. Southern Baptist Hosp., 594 So.2d 571 (La. App.4th Cir.), writ denied 599 So.2d 316 (1992).
Furthermore, the time interval between when Quaynor left work and when the tort occurred was very brief and insufficient, by length of time or by general circumstances, to break the connection with his employment activities. See Wattik v. Lewis Grocer Co., 476 So.2d 444 (La.App.2d Cir.1985). As noted above, the Supreme Court in Ermert recognized the similarity between the test for vicarious liability and the test for workers compensation liability. 559 So.2d at 476. Workers compensation cases have long held that "in the course of employment" includes reasonable intervals before and after working hours while the employee is still on the premises. Carter v. Lanzetta, 249 La. 1098, 193 So.2d 259 (1966). Under this rationale, even though Quaynor may have technically been off duty at the time, the trial court would not be clearly wrong to find that he was close enough in time and place to his employment that this act was still within the scope of employment.
The evidence also shows a strong causal connection between Quaynor's employment and the tort. He made his first improper advances to Evonne during school hours. Quaynor's position as a counselor or staff member, with its obligation to supervise the campers on the premises, and Evonne's as a camper, facilitated the contacts by bringing them in close proximity to one another each day and giving him a superior position to observe her. Quaynor ultimately seized the opportunity to commit the tort when he found her alone at a time and place where her class was normally held. Time, place, causation and purpose all serve to support the trial court's finding of vicarious liability.
Finally, there is the question of foreseeability. As noted above, the Supreme Court in Ermert held that a given incident may be "associated" with the employer's business enterprise if, given the employee's authority, the tortious conduct was "reasonably foreseeable." 559 So.2d at 476. The court equated this not with the "foreseeably unreasonable *562 risk of harm" in negligence cases, but with the test of "arises out of and in the course of" in compensation cases. The court explained:
Rather than looking for risks that can and should be avoided, as is the case with negligence, the court must essentially decide whether the particular accident is a part of "the more or less inevitable toll of a lawful enterprise." The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his commercial activity in spite of all reasonable precautions on his own part. If the particular harm was reasonably foreseeable and the employer failed to take proper precautions to prevent it, he could be primarily liable for his own fault rather than secondarily liable for the fault of his employee.
559 So.2d at 476 (citations omitted).
Grambling sponsored a program for campers between the ages of 12 and 16, and conducted it on a college campus. Contact between college students and NYSP campers was likely under any circumstances, and inevitable when Grambling hired college students to serve as aides with supervisory authority. Grambling perceived that intermingling was potentially dangerous; Coach Collins's testimony on this point is especially pertinent. He explicitly acknowledged that the Student Union was a dangerous place for campers because of the risk that they might be battered, injured or sexually abused by students or third persons there. R. p. 168. The record also shows that even though Quaynor was not hired to teach the girls, he nevertheless had supervisory authority over them and was in a position to associate with them easily. The trial court viewed this incident as part of "the more or less inevitable toll" of Grambling's business of running a sports program for children, in which teenage girls were placed under the general supervisory authority of a 25-year old male college student.
Viewing this evidence, the trial court specifically found that the tortious conduct was "reasonably incidental to the performance of his [Quaynor's] duties such that the risk of harm to young female students was fairly attributable to his employer who had placed him in that position of authority." R. p. 129. This satisfies the foreseeability test discussed in Ermert, supra. On the record presented, we simply cannot declare this finding to be clearly wrong or manifestly erroneous. The judgment finding Grambling vicariously liable is affirmed.

Damages
By its second assignment Grambling contends the trial court erred in assessing damages identical to those assessed against codefendant Quaynor in the latter's default proceeding, at which Grambling was not present. In brief, Grambling asserts that it did not have the opportunity to participate in the default hearing because it never received notice. In essence, Grambling asserts that the damage issue was "prejudged" at Quaynor's default hearing, thus depriving it of the legal right to contest the issue. The trial court dismissed Grambling's rule to set aside the default judgment, finding no showing of fraud or ill practices. La.C.C.P. art. 2004.
We recognize that the trial court is accorded great discretion in deciding when a judgment should be set aside for fraud or ill practices. Kem Search Inc. v. Sheffield, 434 So.2d 1067 (La.1983); La. Health Serv. & Indem. Co. v. Cole, 418 So.2d 1357 (La. App.2d Cir.1982). A final judgment will be set aside for fraud or ill practices only when (1) the circumstances under which the judgment was rendered show the deprivation of legal rights of the litigant who seeks relief, and (2) enforcement of the judgment would be unconscionable and inequitable. Kem Search v. Sheffield, 434 So.2d at 1070. Article 2004 is given a broad interpretation, however, and is not limited to "actual fraud or intentional wrongdoing." It encompasses situations where a judgment is rendered through some improper practice or procedure which operated, even innocently, to deprive the party cast in judgment of some legal right. Id.
According to Grambling, it was deprived of its legal right to receive notice under La.C.C.P. art. 1571. This article, however, requiring adequate notice of trial to all *563 parties, does not apply to default proceedings. La.C.C.P. arts. 1571, 1572, Official Revision Comments. Furthermore, confirming a default without prior notice to opposing counsel is not an ill practice under La.C.C.P. art. 2004 unless the plaintiff's attorney agrees to give his opponent notice before taking the default. Forman v. Belew, 536 So.2d 821 (La.App. 1st Cir.1988). There is no evidence of any such agreement in the instant record.
Moreover, the default judgment was confirmed against Quaynor, not Grambling. Article 1701 clearly provides that if a defendant in the principal or incidental demand fails to answer timely, judgment of default may be entered against him. The default judgment may be taken without waiting for trial on the merits as to other defendants who did file answers. Vehrs v. Jefferson Ins. Co., 168 So.2d 873, 87 (La.App. 3d Cir.1964), writ denied 247 La. 256, 170 So.2d 511 (1965). At its own trial Grambling had the opportunity to fully litigate any potential liability on its own part. Grambling's argument that once the employee is found liable, then the employer is absolutely liable by virtue of the employment relation, is not correct. The law of vicarious liability makes the employer responsible if the employee commits the tortious act in the course and scope of his employment. Ermert v. Hartford Ins. Co., supra. Grambling had adequate opportunity during its own two-day trial to show that Quaynor's act was not within the course and scope of employment.
As to damages, Grambling does not allege that the award is excessive or that it is prejudiced by the amount; it simply urges that it did not have the opportunity to contest the quantum because that amount was fixed at the default hearing. Upon review of the record, we cannot agree. Ms. Dismuke introduced substantial testimonial evidence at Grambling's trial on the issue of damages. Evonne, her parents, Rev. Johnson, Dr. Davidson and Mrs. Champion all testified that she was adversely affected by, and underwent behavioral changes because of, the incident. Grambling had the chance to cross examine each of these witnesses and to adduce evidence supporting a lower award. Notably, Grambling did not call any expert witness to counter Evonne's showing of emotional damage. The trial court considered in light of the new evidence the amount of damages assessed at the prior hearing, and concluded that the prior award was reasonable. Grambling was not deprived of the right to challenge the quantum. Furthermore, enforcing the default judgment against Quaynor, who neither answered the petition nor appealed the judgment, is not inequitable or unconscionable. We find no error.
Ms. Dismuke requested in brief that we review and raise the award, but she has neither appealed nor filed an answer to the appeal. Thus we will not address this claim. La.C.C.P. art. 2133; Dixon v. Mid-South Rail Corp., 580 So.2d 438 (La.App.2d Cir.), writ denied 584 So.2d 1160 (1991).

Conclusion
For the reasons expressed, we find no manifest or legal error in the judgment, and affirm it. Costs of appeal in the amount of $113 are assessed to Grambling to the extent permitted by law. La.R.S. 13:4521, 5112.
AFFIRMED.
VICTORY, J., dissents with reasons.
VICTORY, Judge, dissenting.
The trial court specifically rejected Quaynor's testimony that he went to the student union building (SUB) after 12 noon in his capacity as a counselor to see if the boys in his group were "acting up" in the union. This credibility determination is supported by the record and cannot be disturbed on appeal. Yet, the majority opinion is replete with suggestions that Quaynor was doing something at the SUB for his employer, Grambling, when he assaulted the plaintiff.
The facts necessary to resolve this appeal are not disputed. Quaynor, a Grambling student who lived on campus, was hired to work in the NYSP program to instruct boys. The plaintiff, Evonne Dismuke, who was enrolled in the NYSP program was not supervised by Quaynor, but was supervised by female employees. The plaintiff and Quaynor had met twice during the course of the program which *564 was several weeks long. Weeks before the assault, Quaynor asked the plaintiff the personal question mentioned in the majority opinion, but she never reported it to Grambling or program personnel.
On the day in question, the NYSP program ended at noon due to the weather, and the plaintiff and Quaynor were both dismissed for the day. All NYSP students, including plaintiff, had specifically been told not to go to the SUB except for supervised instruction, but she and her friend went anyway. Quaynor, after being dismissed from the program for the day, went to the SUB, a place where students enrolled at Grambling frequently gathered. He was living on the Grambling campus as an enrolled student at the time of the assault. His testimony that he went to the SUB after he was dismissed for the day in order to check on his NYSP boys was specifically rejected by the trial court on credibility grounds. Thus, both Quaynor and the plaintiff had finished the program for the day and at 12:30 p.m., when the assault occurred, Quaynor was no longer acting in his capacity as an employee for Grambling in the program.
The LeBrane factors strongly indicate no liability on the part of Grambling under these circumstances. First, the tortious act was not primarily employment-rooted. Although it is clear that the plaintiff and the defendant, Quaynor, met during the program, he never exercised supervision over the plaintiff to any significant degree; rather, he daily supervised boys in the program. Second, Quaynor's attack was not reasonably incidental to the performance of his duties for Grambling. His duties with Grambling for the program required him to supervise boys, not girls. Clearly nothing in his duties suggested that he should sexually attack anyone. Third, although the act occurred on Grambling's premises, Quaynor remained on the Grambling campus because he was a student enrolled during the summer term and lived on campus. Further, the attack occurred in the SUB, a place off-limits to the plaintiff and other NYSP students unless they were in class with supervision. Fourth, the attack did not occur during Quaynor's hours of employment; rather, it occurred about a half hour after he was discharged from employment for the day.
The majority's reliance on Ermert v. Hartford Insurance Company is misplaced. In Ermert, the Supreme Court stated that, "the proper test bears more resemblance to that which limits liability for workers' compensation than to the test for negligence, because the employer should be held to anticipate and allow for risks to the public that arise out of and in the course of his employment of labor." Ermert v. Hartford Insurance Company, 559 So.2d 467, 476 (La.1990). Only by disregarding the trial court's specific credibility determination that Quaynor was lying when he said he went to the SUB to "check upon" the boys in the program can the majority make a serious argument under Ermert. An employer is not and should not be required to anticipate and bear the risk that an employee may assault a member of the public after the employee's working hours away from the job's premises, merely because he has met the victim while on the job.
The majority's reliance on Wattik v. Lewis Grocer Co. is also misplaced. In Wattik, the store employee got into an argument with the plaintiff when the employee told the plaintiff he was parking in a no parking zone. Shortly thereafter, the store manager intervened in the verbal dispute and the employee went into the store. He clocked out shortly thereafter, and approached the plaintiff's vehicle with a machete while the vehicle was still in the employer's parking lot. The plaintiff was injured attempting to exit his vehicle a short time later. The employer was held responsible because the time interval was not sufficiently long to break the connection between the employment-rooted altercation and the subsequent assault. In the instant case, there is nothing to suggest that the assault on the plaintiff began while Quaynor was on duty on the day in question and continued after he was off duty. It had been weeks since Quaynor had even spoken to the plaintiff.
When all is said and done, the only connection between Quaynor's employment and the assault is the fact that Quaynor and the plaintiff came into contact with each other during the program. The mere fact that two *565 persons come into contact while one is on the job does not make his employer responsible for an assault by the employee against the other person which occurs after hours and off the premises. Although I am inclined to believe that the assault occurred as plaintiff described it, it clearly happened after both plaintiff and Quaynor were dismissed from the program for the day and Quaynor was no longer acting within the course and scope of his employment. Although I have great sympathy for the plaintiff, justice is not served by ordering Grambling to pay her money when it is not responsible for her damages.
For these reasons, I respectfully dissent. The judgment against Grambling should be reversed.
NOTES
[1] Upon majority, Evonne was substituted as the proper party plaintiff in April 1992.
[2] The trial court indicated in its reasons for judgment that it did not believe Quaynor's testimony that he was in the Student Union in his official capacity as an NYSP counselor. This statement, buried in a footnote, was obviously the result of the court's earlier statement that "probably" Quaynor and Evonne "had prearranged to meet at the Union." The record, however, is completely devoid of evidence of a prearranged meeting between Quaynor and the plaintiff. While we defer to a trial court's factual findings and credibility calls, we will not defer to one that lacks support in the record and amounts to mere speculation. Brown v. Blue Grass Liquor Co., 632 So.2d 904 (La.App.2d Cir.1994). Furthermore, there was no reason for the trial court not to believe that Quaynor understood his duties included checking on unruly campers. His testimony on this point was uncontradicted, and his understanding would be completely consistent with the objectives stated by the sponsors.