661 So.2d 510 (1995)
Amy Elizabeth BAUMEISTER, Plaintiff-Appellee,
v.
Loyce PLUNKETT, et al., Defendants-Appellants.
No. 27,185-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*512 Julia Mann, Lunn, Irion, Johnson, Salley & Carlisle, John Stephens, Shreveport, for appellant.
A. Michael Boggs, Bossier City, for appellee.
Before SEXTON, NORRIS and WILLIAMS, JJ.
WILLIAMS, Judge.
Humana HospitalBrentwood ("Humana") appeals from a trial court judgment holding it vicariously liable for the sexual battery of Amy Elizabeth Baumeister ("Baumeister") by Loyce Plunkett ("Plunkett"), a Humana employee.[1] Baumeister answered the appeal, asserting that the damages awarded her are inadequate. We affirm the judgment of the trial court.

FACTS
On December 27, 1987, Baumeister was working the 3:00 p.m.-11:00 p.m. shift at Humana as a clinical technician. Plunkett was the nursing supervisor on duty. According to Baumeister, she was on break, sitting *513 in a chair drinking a soda and reading, when Plunkett entered the room and suddenly, without warning, was on top of her. She testified that he put one hand between her legs and forced her upward and backward against the wall, while twisting her breast with his other hand and "mashing" his teeth into her face. Baumeister pushed Plunkett off of her, left the room, and returned to her work area. She telephoned her regular supervisor at home and told her what had occurred. She then telephoned her boyfriend to come for her and terminated her shift early.
Plunkett, however, testified that Baumeister entered the supervisor's office and made advances toward him. According to Plunkett, he told Baumeister that he thought she needed to return to her unit and she left. Plunkett stated that the following day, he was contacted by Baumeister's boyfriend who accused him of attacking Baumeister.
Baumeister subsequently filed suit for damages against Plunkett and Humana, asserting that Humana was vicariously liable for the actions of Plunkett. The trial court found in favor of Baumeister and awarded her a total of $265,735.50 in damages.
On appeal, Humana asserts that the trial court erred in finding that the attack occurred, in finding Humana vicariously liable for Plunkett's conduct and in awarding excessive damages. Baumeister contends that the damages awarded are abusively low.

The Battery:
Humana argues that the evidence does not support the finding that the attack actually occurred and, specifically, that because of inconsistencies in Baumeister's account of the alleged attack, the trial court erred in crediting her testimony over that of Plunkett.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. In order to reverse a factfinder's determination, the reviewing court must review the record in its entirety and meet the following two-part test: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through Dept. of Transportation and Development, 617 So.2d 880 (La.1993).
Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
During the plaintiff's case in chief, Plunkett testified:
Well, the incident that Ms. Baumeister talks about I remember her coming into my office that day. The door was open, the door was never closed, but I don't remember attacking Ms. Baumeister. I remember her coming in and making some advances. I did tell her that I thought she needed to go back to her unit.
Plunkett also stated, "I'm not admitting there was any physical contact." However, he further testified that she touched him but he did not touch her. On direct examination by the defense, when asked what Baumeister said or did, Plunkett testified that he remembered only that she came around the desk and touched him. He indicated that a few days after the incident, at the request of Cynthia Joiner, Humana's director of nursing, he wrote a detailed statement of the events of the evening.
Later, during the trial, after reviewing his previous statement of January 13, 1988, *514 Plunkett testified that he, rather than Baumeister, entered the room while Baumeister was sitting in a corner chair reading a magazine. According to Plunkett, Baumeister called him over and began making advances toward him. He stated, "[S]he stood up rubbing herself all over me. I backed up and sat down in my chair." Plunkett testified that he did not initially recall the incident because he deemed it insignificant.
According to Plunkett, the day after the incident, Baumeister's boyfriend telephoned him and asked why Plunkett did that to her. Plunkett indicated that he then telephoned Baumeister. Plunkett testified that although Baumeister said, "You know what you done to me," she never gave him a specific explanation. Plunkett further testified that he did not know what was going on and did not learn the specifics of the alleged incident until he was contacted for deposition some two years later.
However, Plunkett's written statement of January 13, 1988, which was admitted into evidence, states that her boyfriend who telephoned him accused him of bruising and trying to "rape" Baumeister. In addition, Plunkett's statement indicates that Baumeister informed him that she had reported that he "twisted her wrist, slammed her against the wall, burst her lips and bruised her nipples." In his statement, Plunkett described her as "hysterical and screaming" as she ended the telephone conversation. When confronted with the discrepancy in his accounts, Plunkett responded that he did not recall that conversation. He further testified, "This incident was not really significant. I didn't think any more about this incident."
Plunkett also testified that he could not have committed the attack described by Baumeister because he had "constant back pain" in 1987, and did not do any lifting, bending or strenuous work. Dr. Robert E. Holladay, an orthopedics specialist, testified that he first saw Plunkett for disk problems in October 1987 and performed back surgery on him in February 1988. Given the description of the attack, Dr. Holladay indicated that he would be surprised if Plunkett could have exerted himself to that degree without experiencing significant pain or difficulty with his back. He acknowledged, however, that it would not have been impossible for Plunkett to execute the attack and that Plunkett's condition would have made it easier for him to be repelled by the victim. Baumeister testified that she was in the room, sitting in the corner reading by a lamp when Plunkett entered the room and turned off the overhead light. Suddenly, according to Baumeister, Plunkett was on top of her and was pushing her, across the back of the chair, into the wall. She stated, "He was pushing on me with such force that I was already crammed back as far into the wall as far [as] I could be but he just kept pushing." She testified that as Plunkett pushed her with his left hand between her legs, he twisted her breast with his right hand and pressed his teeth into hers, catching her lip between them. Baumeister testified, "I eventually got him pushed off of me and when I did he sat down in a chair ... and when he did the chair kind of slid back a little bit and bumped and he just started laughing." Baumeister stated that Plunkett then suggested that they go to a deserted floor and "finish this."
Dana Wilson, Baumeister's regular supervisor, testified that Baumeister telephoned her at home at approximately 10:00 p.m. on the night of December 27, 1987, reporting that Plunkett had physically attacked her. Wilson testified that she provided a written statement to the hospital within a day or two of the incident. Baumeister's testimony regarding the incident is consistent with her report to Wilson the night of the attack, with the exception of a discrepancy in how she identified the room where the attack occurred. Wilson's statement indicated Baumeister reported that Plunkett grabbed her, held her down and attempted to kiss her, bursting her lower lip with his teeth. She also reported that he touched her breast and genital area and was very aggressive and "rough." Wilson, however, opined that Baumeister has difficulty distinguishing fact from fiction and that the incident did not occur as Baumeister reported.
Frank Lesley Tiller, Jr., Baumeister's boyfriend at the time of the attack and spouse at the time of trial, testified that she called him from work, told him that Plunkett *515 had attacked her and asked that he come for her. Tiller stated that when he picked her up she was "distraught" and had been crying. He testified that Baumeister had red marks on the back of her shoulder. He acknowledged having telephoned Plunkett the following day because he was angry and upset. Tiller testified that in their telephone conversation, Plunkett neither admitted nor denied the accusations.
Dr. John Gregorio, a specialist in internal medicine, testified that he saw Baumeister on December 29, 1987, and that she gave a history of having been attacked by a co-worker. He indicated that she reported that the individual had grabbed her left breast and groin area and had burst her lip with his teeth. Dr. Gregorio stated that Baumeister indicated that in the struggle she strained her lower back, left forearm, and right wrist. On her right lower lip, he found her to have a mild superficial ulceration consistent with traumatic etiology. Dr. Gregorio testified that although he saw no swelling or bruising, he noted tenderness of the right wrist, lower back, and left breast. His impression was muscular strain of the lower back and soft tissue contusion of the wrist and breast. Dr. Gregorio testified that Baumeister was very upset and crying during the interview and that he had felt she was honest. In regard to the emotional distress, he suggested to her that she see a psychiatrist or psychologist to talk about the event.
Dr. Edward L. Anglin, an orthopaedic specialist, testified that he first saw Baumeister on January 14, 1988, for treatment of cervical strain and lumbar strain, which she related to the attack at work on December 27, 1987. He testified that her physical examination was consistent with the history she gave. He noted that on the initial visit Baumeister weighed 165 pounds. When Dr. Anglin last saw Baumeister on March 17, 1988, he recommended that she continue physical therapy and medication.
The trial court, in its opinion, stated:
Mr. Plunkett's testimony of the events was incredible in the strictest sense of the word. He was not able to recall events which clearly he should have been able to relate, and the court concludes that his testimony was not truthful and as [sic] not worthy of belief.
After reviewing the record in its entirety, we find that the evaluations of credibility and inferences of fact of the trial court were reasonable. Although there was some inconsistency in Baumeister's testimony, the trial court was not clearly wrong in crediting her testimony over that of Plunkett. In addition, Baumeister's account of the attack generally is supported by the testimony of Wilson, Tiller, Dr. Gregorio, and Dr. Anglin. Accordingly, we cannot say that the trial court was manifestly erroneous in its determination that Plunkett attacked Baumeister on December 27, 1987, as she testified.

Vicarious Liability:
Humana asserts that the trial court was clearly wrong in finding that Humana was vicariously liable for the actions of Plunkett. Humana argues that an employer is not vicariously liable for the intentional acts committed by its employee unless the employee is acting within the ambit of his assigned duties and in furtherance of his employer's objectives.
Employers are answerable for the damage caused by their employees in the exercise of the functions in which they are employed. LSA-C.C. Art. 2320. The employer's liability in such a case is referred to as vicarious liability. The findings that support or refute vicarious liability are factual in nature and, as such, are regulated by the manifest error rule. Dismuke v. Quaynor, 25,482 (La.App.2d Cir. 04/05/94), 637 So.2d 555, writ denied, 94-1183 (La. 07/01/94), 639 So.2d 1164.
The employment connection tort test is similar to that used in determining whether a compensation claim is one arising out of and in the course of employment. Course of employment refers to time and place, whereas scope of employment considers employment-related risk of injury. A strong showing on one may compensate for a relatively weak showing on the other. When the duties of employment place the employee at the accident site, the employment creates a zone of special danger. This rule applies to assaults. *516 When an employee is taking a permissible break, a battery arises from employment regardless of the root cause of the dispute. Benoit v. Capitol Mfg. Co., 617 So.2d 477 (La.1993).
The fact that the predominant motive of the employee is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the employer's business actuates the servant to any appreciable extent, the employer is subject to liability if the act is otherwise within the service. The act may be found to be in the service if not only the manner of acting but the act itself is done largely for the employee's purposes. The scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the employee in performing his assigned tasks. Ermert v. Hartford Insurance Co., 559 So.2d 467 (La.1990).
In the instant case, it is undisputed that both Baumeister and Plunkett were employed by Humana and that Plunkett was Baumeister's supervisor at the time of the incident. Both were working the 3:00 p.m. to 11:00 p.m. shift. The incident took place on the employer's premises. Baumeister was on a permissible break and Plunkett was serving in a supervisory capacity, which, he testified, required him to rove the entire hospital. He had supervisory authority over Baumeister, and their employment placed both of them at the site of the incident. Both Baumeister and Plunkett were in the course and scope of their employment. Plunkett's employment facilitated his attack on Baumeister. On the record presented, we cannot say that the trial court was clearly wrong in finding Humana vicariously liable for Plunkett's sexual battery of Baumeister.

Causation and Damages:
Humana argues that the trial court erred in finding that the conditions alleged by Baumeister were related to the attack and in awarding her an excessive amount of damages. Baumeister argues that the trial court erred in awarding her an insufficient amount of damages. She contends that she should be awarded past lost wages and she seeks to increase in the future medical expenses award from $50,000 to $100,000 and the general damages award from $200,000 to $665,000.
Causation is a factual question, and the trier of fact's determination cannot be disturbed absent manifest error. Morris v. Allstate Insurance Co., 25,148 (La.App.2d Cir. 02/23/94), 632 So.2d 1209, writ denied, 94-1044 (La. 06/17/94), 638 So.2d 1099. The weight to be accorded testimony of experts depends largely on their qualifications and the facts on which they base their opinions. The trial court may evaluate expert testimony by the same principles that apply to other witnesses and has great discretion to accept or reject medical or lay opinion. Morris, supra. The court of appeal reviews judgments, not reasons for judgment. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App.2d Cir.1991).
Baumeister testified that following the attack she "hurt all over" and that as of the time of trial she continued to have pain in her back. She detailed having seen a number of physicians for treatment of back and neck problems as well as having physical therapy and chiropractic treatment. Baumeister also testified to having been in treatment with several mental health professionals regarding psychological problems she experienced following the battery. She described having had difficulty being in crowds and going places alone, sleep problems, nightmares and fears that someone was going to walk in the door at night such that she stayed with friends for two to three weeks and subsequently would pile objects to barricade the door. In addition, Baumeister testified that she was seen by dermatologists for treatment of skin problems, involving severe itching and open sores, which developed following the battery. She testified that the skin condition was explained to her by one dermatologist as a physical reaction to psychological trauma. Baumeister has scarring over most of her body as a result. Baumeister further testified that she had experienced weight gain since the attack. She, at five foot four inches tall, weighed about 165 pounds at the time she was battered and 230 *517 pounds at the time of trial. She acknowledged having suffered physical abuse in a previous marriage. She stated that she did not recall having received counseling before the attack occurred. Baumeister acknowledged that she was previously hospitalized at Charter Forest Hospital, but stated it was for hypertension, not counseling.
Dr. Gerald Baker, a psychologist who treated Baumeister from January through May of 1988, described her as having been "quite distressed, agitated, angry, frustrated, withdrawn, alternating between depression and anxiety." He testified that he diagnosed her as having "post traumatic stress disorder," as a result of the attack.
Dr. David Cooksey, a dermatologist, saw Baumeister for consultation regarding her skin condition on August 30, 1991. He testified that he diagnosed her as having "neurotic excoriation secondary to the mental trauma of being physically attacked." Dr. Cooksey elaborated that neurotic excoriation is a physical expression of emotional turmoil. He indicated that although this condition can result from other types of psychological trauma, he had no reason not to believe the history provided by Baumeister. Dr. Cooksey testified that when he saw Baumeister she was continuing to have flashbacks and nightmares, which would aggravate her skin condition. He further testified that the scarring on her skin is permanent. Dr. Cooksey prescribed medication and recommended psychiatric treatment. He opined that if the psychological problems persist, she will continue to need dermatological treatment and will probably develop more permanent scarring.
Dr. John J. Jucas, also a dermatologist, testified that he first saw Baumeister for treatment in March 1993, and that she gave a history of itching skin since 1988. His diagnostic impression was neurotic excoriations. He testified that she has multiple excoriation marks and permanent scarring.
Dr. N. Patricia Stockard, a psychiatrist who saw Baumeister briefly in September 1991, testified that she saw her for symptoms of depression, sleep disturbance, anxiety, and dermatological changes. She testified that Baumeister related her anxiety to her school work. Dr. Stockard diagnosed Baumeister as having an "adjustment disorder with mixed disturbance of mood, meaning depression and anxiety." She did not, at the time, relate the disorder to the sexual attack although Baumeister reported it to her. Dr. Stockard opined, however, that her impression was consistent with Dr. Cooksey's diagnosis and also with Dr. Baker's diagnosis, in that anxiety and depression are components of post traumatic stress disorder. Dr. Stockard opined that Baumeister's skin condition, increased appetite, hypervigilance, sleep disturbance, anxiety and depression were related to the sexual battery. She opined that if Baumeister had been sexually molested as a child, had an overbearing, uncooperative mother and had an abusive husband, she would have been more susceptible to having the symptoms she developed after the attack by Plunkett. Dr. Stockard testified that she prescribed medication and recommended counseling for Baumeister. She opined that although persons who have been sexually assaulted learn to cope better, they never entirely recover. Dr. Stockard testified that Baumeister will require intensive, multi-faceted therapy over an extended period of time, at an estimated cost of $50,000 to $100,000.
Dr. Berry Marvin Osherowitz, a specialist in internal medicine, testified regarding his treatment of Baumeister in June 1987, prior to the attack. He stated that, among a number of physical problems, Baumeister reported a history of physical and sexual abuse, mental illness of her mother, and a suicide by someone in the family. In addition, he testified that Baumeister reported that she smoked ten cigarettes a day, had some sleep problems, and had some type of nervous rash. He indicated the rash was clinically insignificant and he did not treat it. Dr. Osherowitz testified that she weighed 179 pounds at the time and reported having lost 20 pounds. He diagnosed stress, anxiety, panic attack and hypertension. Dr. Osherowitz prescribed medication and referred her to a social worker regarding the stress.
The defendants introduced into evidence Baumeister's medical records from Charter Forest Hospital, which reflect treatment *518 from February 4, 1986 through March 12, 1986. The records reflect a course of psychological evaluation and treatment with a final diagnosis of "adjustment disorder with mixed emotional features."
Dr. Robert Hernandez, a specialist in internal medicine, testified regarding his consultation on Baumeister in June 1987, prior to the attack, while she was in Highland Hospital. He indicated her chief complaint was chest and abdominal pain. Dr. Hernandez testified that he saw no skin disorder and although she reported a history of depression and panic attacks, neither were present at the time. Dr. Hernandez opined that a patient can have anxiety as a result of chest pain because they fear a cardiac event. He also opined that Baumeister's chest pain was not psychiatric in origin. He testified that Baumeister was discharged on medications for a micro valve prolapse, possible gastro intestinal disturbance and anxiety. At the time of her hospitalization, she weighed 174 pounds. Dr. Hernandez testified that for a woman of Baumeister's height, 120 pounds would be the ideal weight. He opined that significant weight fluctuations can be an indication of metabolic disorder or psychological problems.
Sion Edward Jenkins, II, a social worker who saw Baumeister for counseling in 1991, testified that in the course of treatment she identified the primary stressors in her life to have been her relationships with her mother and her husband and the attack by a co-worker. He further indicated that she reported back injury, nervousness at night, sleep problems, and fears of being around other people as a result of the attack. Jenkins indicated that Baumeister reported a weight gain of about 70 pounds in the prior one and one-half years. He noted, too, that she had quit smoking.
After reviewing the record, including testimony of the various medical and mental health professionals, as well as documentary evidence, we find that the trial court's conclusion that Baumeister is "truly an "egg shell" plaintiff and that the assault by Plunkett caused considerable and serious aggravation to her fragile condition" is a reasonable view of the evidence and is not clearly wrong.
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but to review the exercise of discretion by the trier of fact. The discretion vested in the trier of fact is "great," even vast, so that an appellate court should rarely disturb an award of general damages. Only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case that the appellate court should alter the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
After a review of the record, we find that although the trial court's general damages award in the instant case is on the high side, given the circumstances of the case, we cannot say that it is abusively high. In addition, we find no abuse of discretion by the trial court in its specific damage awards, including the denial of recovery for past lost wages. The damage awards are affirmed.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendant, Humana HospitalBrentwood.
AFFIRMED.
NOTES
[1] Plunkett's appeal was dismissed for failure to timely file a brief. 27,185 (La.App.2d Cir. 06/14/95).